Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2021 SEP 10  AM 11: 52

CLERK
BY _____
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
for the
District of Vermont ▼

_____ Division

Timothy Dasler

*Plaintiff(s)*
*(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

-v-

Jennifer Knapp (F.K.A Jennifer Dasler)

*Defendant(s)*
*(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

Case No. 2:21-cv-135
*(to be filled in by the Clerk's Office)*

Jury Trial: *(check one)* ☑ Yes ☐ No

## COMPLAINT FOR A CIVIL CASE

### I. The Parties to This Complaint

#### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Timothy Dasler |
| Street Address | 488 NH RT 10 Apt D |
| City and County | Orford |
| State and Zip Code | NH 03777 |
| Telephone Number | 802-369-9993 |
| E-mail Address | t_dasler@hotmail.com |

#### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Defendant No. 1

    Name: Jennifer Knapp (F.K.A. Dasler)

    Job or Title (if known):

    Street Address: 513 Tigertown Rd

    City and County: Norwich Windsor County

    State and Zip Code: VT 05055

    Telephone Number: 802-281-9084

    E-mail Address (if known): jknapplynn@gmail.com

Defendant No. 2

    Name:

    Job or Title (if known):

    Street Address:

    City and County:

    State and Zip Code:

    Telephone Number:

    E-mail Address (if known):

Defendant No. 3

    Name:

    Job or Title (if known):

    Street Address:

    City and County:

    State and Zip Code:

    Telephone Number:

    E-mail Address (if known):

Defendant No. 4

    Name:

    Job or Title (if known):

    Street Address:

    City and County:

    State and Zip Code:

    Telephone Number:

    E-mail Address (if known):

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

## II. Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

[✔] Federal question      [✔] Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A. If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.
42 U.S.C § 1983 and § 1985 based upon the 4th, 5th, and 14th Amendment
Declaratory Judgement Act 28 U.S.C §§ 2201(a) and 2202 with supplemental jurisdiction over state law claims pursuant to 28 U.S.C § 1387
Challenge to state statute and practices pursuant to the 14th Amendment

### B. If the Basis for Jurisdiction Is Diversity of Citizenship

1. The Plaintiff(s)

    a. If the plaintiff is an individual
    The plaintiff, *(name)* Timothy Dasler, is a citizen of the State of *(name)* New Hampshire.

    b. If the plaintiff is a corporation
    The plaintiff, *(name)* _____, is incorporated under the laws of the State of *(name)* _____,
    and has its principal place of business in the State of *(name)* _____.

    *(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2. The Defendant(s)

    a. If the defendant is an individual
    The defendant, *(name)* Jennifer Knapp, is a citizen of the State of *(name)* Vermont. Or is a citizen of *(foreign nation)* _____.

Page 3 of 5

      b.    If the defendant is a corporation

           The defendant, *(name)* _____, is incorporated under the laws of the State of *(name)* _____, and has its principal place of business in the State of *(name)* _____.

           Or is incorporated under the laws of *(foreign nation)* _____, and has its principal place of business in *(name)* _____.

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.    The Amount in Controversy

The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

damages to be determined at trial will exceed $75,000 which include lost business, lost reputation, costs in defending against malicious prosecution and abuse of process, unconstitutional deprivation of civil rights, and intentional torts

## III. Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

see attached

## IV. Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

See Attached

## V. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 3/3/21

Signature of Plaintiff

Printed Name of Plaintiff   Timothy Dasler

### B. For Attorneys

Date of signing:

Signature of Attorney
Printed Name of Attorney
Bar Number
Name of Law Firm
Street Address
State and Zip Code
Telephone Number
E-mail Address

## CLAIMS

### Claim 1 - § 1983 based upon 4th, 5th, and 14th Amendment-

1. On 5/15/17 Ms. Knapp filed and obtained a temporary ex-parte order stripping Mr. Dasler of parental rights and consequently forcing him to pay her child support in the equivalent of a pre-trial attachment.

2. Ms. Knapp was subsequently ordered to "normalize contact" on 6/12/17, 8/1/17, and 2/23/18. She did not prevail on the merits of the temporary restriction of rights.

3. The statute, practice, and precedent in Vermont bound the lower court such that Ms. Knapp's restriction of Mr. Dasler's rights results in a default change of status irrespective of the merits of that temporary restriction of rights.

4. Ms. Knapp also vetoed shared parental rights as allowed by state statute.

5. As a result of Ms. Knapp's usurpation of court authority it was neither able to preserve Mr. Daslers rights, nor could it require her to meet any burden of proof(based upon state court precedent).

6. Because of Ms. Knapp's pre-trial ex-parte action the burden shifted to Mr. Dasler to prove it was harmful for her to retain custody rather than requiring that she justify the restriction of his rights. Through her fraudulent accusations and ex-parte action she was able to deprive Mr. Dasler of an opportunity to have a fair hearing.

### Claim 2 - Malicious Prosecution and Abuse of Process -

7. Ms. Knapp inundated Mr. Dasler with filings through 2017-2018 usually without probable cause and/or for purposes other than the legitimate use of the filings.

8. On 5/12/17 she falsely accused Mr. Dasler of assault for the purpose of controlling their child custody case and providing a smoke screen to prevent scrutiny of her history of violence and mental health issues that have been life threatening to both Mr. Dasler and Ms. Knapp.

9. On 5/15/17 She filed for a Relief From Abuse Order based upon these fraudulent accusations.

10. On 6/9/17 She agreed to contact through a Mediation Agreement(subsequently ordered by the court on 6/12/17)

11. On 7/18/17 Ms. Knapp cancelled a court-ordered visit, and when Mr. Dasler objected to her refusal to make up time with a text stating "Not your choice. There's a court order." Her attorney notified Mr. Dasler they were filing a motion to suspend visitation.

12. In the 7/19/17 Motion they produced a secretly recorded call that predated mediation, which Ms. Knapp falsely claimed was a "threat" which she claimed was inferred by Mr. Dasler's "controlled" tone of voice.

13. The 7/19/17 Motion also included an accusation of an injury to the minor child that Mr. Dasler "did not explain". Ms. Knapp attempted to get an RFA for the child with this false claim.

14. At the 8/1/17 RFA hearing Ms. Knapp learned that Mr. Dasler had recordings of child exchanges and she admitted on cross examination that Mr. Dasler told her the 1 year old child had slipped and fallen in the bubble exhibit at the science museum because she wasn't wearing shoes because she had only provided water shoes for the visit. (in other words, thoroughly explained).

15. Her admission upon the realization that he had evidence of the conversation, illustrates that she knew her filing was false.

16. Mr. Dasler pled the 5th on 8/1/17 because of the pending criminal charges stemming from her 5/12/17 accusation.

17. After the 8/1/17 Hearing the RFA for the child was denied as was the Motion to Suspend Visitation.

18. At the 2/16/18 Temporary Parent Child Contact Hearing he finally had an opportunity to present evidence and showed photos disproving Ms. Knapp's claim that the child had developed a bruise or black eye. It was also established that the alleged injury was from 7/4/17, 2 weeks before her "emergency motion", and she produced no evidence of any developed injury or

explanation why it suddenly became in emergency.

19. The 2/16/18 Hearing denied Ms. Knapp's Motions dated 12/6/17, 12/12/17, 1/2/18, and 1/30/18 seeking to obstruct Mr. Dasler's parental contact.

20. Ms. Knapp filed motions repeatedly within 2-10 days of Mr. Dasler asking for makeup visitation after she cancelled visits. She filed a total of 7 motions over 9 months totaling 170 pages of filings seeking to interfere with Mr. Dasler's contact.

21. In Dec. 2017 Ms. Knapp used her temporary award of Sole Parental Rights to source a therapist for the sole purpose of advocating to obstruct Mr. Dasler's visitation.

22. This helped her renew efforts to restrict contact without any new cause by having the therapist claim that both the court and Ms. Knapp were wrong in agreeing to "work to normalize contact" 6 months prior.

23. Without any new cause she sought to relitigate the issue and undo the Mediation Agreement.

24. Simultaneously, Ms. Knapp, through counsel, continued to offer 50/50 visitation if Mr. Dasler would agree to give her sole parental rights. It was clear that the flood of motions was an extortion scheme seeking to make Mr. Dasler cave because he couldn't afford the litigation and she could continue to obstruct contact without needing to prove the merits.

25. Mr. Dasler's recordings forced Ms. Knapp to be more vague in accusations, so the lack of specificity after the accusations of 5/12/17 and 7/19/17 resulted in the court dismissing her motions.

26. Mr. Dasler still faced a significant cost in defending against the simultaneous criminal and civil litigation.

27. Ms. Knapp also falsely accused Mr. Dasler of stalking on 11/11/17 and child endangerment on 2/25/18, these did not result in criminal charges.

28. After the court ordered 50/50 visitation on 2/23/18 Ms. Knapp filed 3 more motions on 2/28/18 seeking to obstruct the 2/23/18 Order.

29. The court again denied these motions and Ms. Knapp fired her attorney causing a lull in filings leading up to the final divorce hearing.

30. After the 8/16/18 Final Divorce Order Ms. Knapp again filed a frivolous motion alleging "contempt of court" which the court promptly dismissed. The goal of this motion was not to actually hold Mr. Dasler in contempt as there was no cause. Instead, it was a smoke screen for Ms. Knapp cutting Mr. Dasler off from contact with the child's therapist after the child began saying her mother was grabbing and shaking her and "mommy hits".

31. The therapist in question is the same one Ms. Knapp had initially hired as an extension of her legal team in the advocacy to restrict Mr. Dasler's contact.

32. Mr. Dasler pled No Contest to lesser charges of Disturbing the Peace in October 2019 resolving the criminal accusation without a finding that would be relevant in the Family Court proceedings.

33. While it is confusing in which circumstances a lesser plea may be considered "prevailing" for the purposes of Malicious Prosecution, the independent action here on fraud and the § 1983 suit will be the first actual adjudication in which both parties are free to present evidence in a hearing about the assault allegation. Such proceedings would include evidence unavailable at the time of the family court proceedings and not otherwise heard because of the lesser plea.

34. Such proceedings will establish that Ms. Knapp fabricated probable cause for the purpose of obtaining a fraudulent judgement and RFA in an extortion scheme to force Mr. Dasler to give up his rights under the threat of false imprisonment and/or being stripped of parent-child contact entirely.

**Claim 3 - Intrusion Upon Seclusion –**

35. After Ms. Knapp's fraudulent Assault Allegation on 5/12/17 Mr. Dasler was arrested.

36. Mr. Dasler was still logged in to his email account on a laptop that only he used.

37. Ms. Knapp used that computer to intercept, read, and delete emails from Mr. Dasler's private

email account.

38. On 5/30/17 Ms. Knapp secretly recorded a FaceTime conversation with Mr. Dasler while he was in NH and such recording is a crime.

**Claim 4 - Stalking, False Imprisonment, and Kidnapping -**

39. MS. Knapp obtained the 5/15/17 temporary relief from abuse order(RFA), which was based upon the false allegation of assault, and obtained a final RFA on 8/1/17 while Mr. Dasler pled the 5th.

40. On 6/9/17 the parties signed a Mediation Agreement including 4 hours/week of visitation at the local aquatic center or museum, and agreed to work to "normalize contact".

41. During Mr. Dasler's visits with the child Ms. Knapp would remain on the premises watching Mr. Dasler from the parking lot.

42. Ms. Knapp used the RFA's criminal penalties for Mr. Dasler being within 300 Ft of her to control his freedom of movement.

43. She admits in affidavits to dozens of occasions where she confined him into a smaller area for hours at a time during visitation.

44. On multiple occasions she followed him with intent of controlling where he was allowed to go on penalty of arrest, and admitted in at least one instance that her intent was to force him to remain inside the aquatic center during his visitation by using the RFA to control his freedom of movement.

45. Visitation was confined to these public locations, both of which have outdoor recreational areas including trails.

46. When Ms. Knapp followed Mr. Dasler on walks, and placed herself strategically to force him to go inside the building it was an unreasonable interference with his freedom, and served no legitimate purpose.

47. Ms. Knapp admits to sitting in the parking lot and watching Mr. Dasler for hours at a time with

her parents, who also aided in following Mr. Dasler and survieling him.

48. Ms. Knapp entered Mr. Dasler's car on one occasion during visitation, causing him to begin parking farther away from the site of visitation.

49. Ms. Knapp's filings confirm she, with the aid of her parents have sought his car out as much as ¼ mile away by their own admission.

50. After the 2/23/18 Court Order for 50/50 visitation Ms. Knapp sought to obstruct the first exchange for over night visitation by framing Mr. Dasler for Child Endangerment.

51. At the 2/25/18 exchange Ms. Knapp, with the aid of her parents, 'set the scene' by going into the back seat of Mr. Dasler's car, exposing some tools in a tool case, taking a photo, and then calling the police alleging "child endangerment".

52. Mr. Dasler could her her from inside her car several car lengths away yelling about the child being surrounded "knives and chisels". The child was never in Mr. Dasler's car, nor were the knives or chisels in the tool bag. She apparently hoped to infer this through the photos they took and expecting that a police search would uncover such implements.

53. The police report confirms that the police confronted Ms. Knapp about her deception.

54. In the interim, Ms. Knapp withheld the child for an hour awaiting the arrival of police in the attempt of framing Mr. Dasler again so she could obstruct the implementation of the court order.

55. Ms. Knapp also hired someone to wait/watch Mr. Dasler by staking out the daycare on 2/26/18 to observe Mr. Dasler and the minor child's interaction there.

56. On 2/28/18 Ms. Knapp filed several more motions seeking to obstruct the 2/23/18 Order.

57. Also on 2/28/18 Mr. Dasler had a session with the child and her therapist in Quechee VT(which Ms. Knapp had advanced notice of). Given the recent events Mr. Dasler was afraid they would again try to frame him for a crime, so he set up a camera to watch his car. He purposefully parked in the far back corner of an un-traveled part of the lot. His camera shows a man circling

his car twice shortly after Mr. Dasler went inside. The man takes his trail camera, but the dash cam still caught his surveillance of Mr. Dasler's vehicle.

58. Given Ms. Knapp's numerous acts of stalking, coopting and/or hiring others in the aid of this it seems very likely that Ms. Knapp was involved with this man and his surveillance of the vehicle and taking the camera.

59. In the summer of 2020 Ms. Knapp put a GPS tracking and recording device on their minor child without Mr. Dasler's knowledge so he could be tracked and recorded without his knowledge and/or consent in NH(where secret recording is illegal)

60. When Mr. Dasler discovered and disabled the tracking device Ms. Knapp immediately called one of Mr. Dasler's family members seeking his location during his vacation.

61. She followed up with at least one other family member trying to track Mr. Dasler for no legitimate purpose.

62. Ms. Knapp's parents have been observed concealed watching Mr. Dasler as recently as 2021

**Claim 5 Assault –**

63. When Mr. Dasler told Ms. Knapp he was leaving on 5/12/17 she set out to frame him for assault.

64. Ms. Knapp went to work that morning, and Mr. Dasler initially stayed home before attending to business appointments both inside and outside the home that day.

65. That afternoon Ms. Knapp called an attorney, who's only involvement in the case was to set up an RFA the following business day(arranged before she had probable cause of assault).

66. She then called her mom and her cell phone data shows her traveling to Thetford(where the child's daycare is) and calling Mr. Dasler to learn his route that day.

67. In a 7 minute call Mr. Dasler reluctantly gave her his route at her insistence, and confirmed he had not yet picked up their child.

68. Ms. Knapp's cell phone data and RFA affidavit confirm she then checked on the child at the

daycare, but did not pick her up.

69. Instead, according to the location data, Ms. Knapp continued to wait for Mr. Dasler near the Thetford Exit before following him to the marital home.

70. Mr. Dasler stopped at the Post Mills gas station, and saw Ms. Knapp drive past(the gas station is right around a tight curve, so she likely lost track of him there).

71. When Mr. Dasler arrived at the marital home Ms. Knapp, by her own admission, took physical control of the child and used physical force against Mr. Dasler to prevent the previously agreed upon parent-child contact.

72. She made various justifications in filings including he was "going to put her to bed late", he was going camping and it was "too cold", he had threatened/attempted to "kidnap" the child. None justify her use of physical force against Mr. Dasler.

73. Ms. Dasler also testified that she did not know Mr. Dasler's whereabouts that day, although the cell phone evidence clearly shows she tracked him to multiple locations, and she would later claim she could "hear the child in the background" during the phone call with Mr. Dasler, which is at odds with both her earlier RFA affidavit and the cell phone evidence with both indicate she went to the daycare.

74. After Ms. Knapp took physical control of the child Mr. Dasler continued to pack the car for the camping trip with the child, and Ms. Knapp took the child to the park in Vershire, which is out of sight of all the neighbors.

75. Mr. Dasler went to the park after packing the car, and Ms. Knapp physically attacked him repeatedly pushing him, and striking him with an open palm. Mr. Dasler continued to back away from her as she did this.

76. Then Ms. Knapp picked up the child, who had kept trying to engage in play with her father, and put the child in a baby swing where she would be confined.

77. When Mr. Dasler tried to reason with Ms. Knapp she kept yelling at him "YOU CHOSE

THIS!!"

78. Then, with the child constrained, Ms. Knapp turned on Mr. Dasler and rushed towards him abruptly and swung towards his testicles.

79. Mr. Dasler braced against her to prevent her from making contact, and backed away. He then left and both parties called the police.

80. Mr. Dasler asked for help leaving safely, and Ms. Knapp alleged assault(finally justifying the RFA she had already planned with the attorney that afternoon). Mr. Dasler was arrested.

81. Ultimately, Mr. Dasler plead No Contest to lesser charges of Disturbing the Peace and plead the 5th up until the plea deal, so her conduct has not been adjudicated.

**Claim 6 - Interference with Contract and Interference with Visitation–**

82. Ms. Knapp used the 5/12/17 false allegation and 5/15/17 RFA detailed in Claim 1, 2, and 5 to get a temporary order restricting contact in the equivalent of a pre-trial attachment.

83. On 6/9/17 The parties entered into a Mediation Agreement regarding contact with their minor child.

84. On 7/19/17 Ms. Knapp unilaterally suspended visitation with a combination of false allegations detailed in Claim 2

85. Using a series of false claims, weaponization of Parental Rights(obtaining a therapist to make an end run around the Mediation Agreement and court order), and malicious/abusive use of process she obstructed the terms of the agreement/order for 9 months before the court intervened and entered a new order, however, there is no redress available in Family Court for the violations of the order, just a modification to set new standards and eventually stop future abuse.

86. She also stripped Mr. Dasler of contact through ex-parte actions to which Mr. Dasler had no ability to present a defense.

87. Ms. Knapp has also refused to attempt mediation at any point prior to filings in spite of the

agreement between the parties adopted by the court in the 8/16/18 Order. Ms. Knapp's filing in October 2018 Motion for Contempt was filed without attempting mediation or notifying Mr. Dasler of the pending filing.

88. Ms. Knapp's Sept. 2019 Motion for Contempt was filed after Mr. Dasler already proposed a solution and requested mediation. Ms. Knapp did not attempt mediation before filing.

**Claim 7 - Fraud –**

89. Ms. Knapp, through her ex-parte actions illustrated in claims 1, 2, 5, and 6, obtained judgements through fraud that foreclosed an opportunity to present a defense.

90. While Ms. Knapp worked the dual civil/criminal systems Mr. Dasler was not at liberty to delay the family case, which proceeded while he pled the 5th. Neither a stay nor immunity would be of any avail while she is withholding contact(which favors her regardless of whether she prevails on the merits) and is working with the prosecutor so immunity is useless.

91. If Mr. Dasler waived the 5th it would be of no use because VT Case Law indicates that Ms. Knapp can prevail on the temporary restriction of contact regardless of whether Mr. Dasler proves "no factual basis" to her allegations. Thus, waiving the 5th only opens him up to risk, doesn't help the family court case.

92. The family court proceedings concluded before Mr. Dasler's criminal defense uncovered the physical evidence now available.

93. The evidence of such fraud was not available at the time of the hearing and the extrinsic fraud denied the court jurisdiction to preserve Mr. Dasler's rights.

94. By nature, the fraudulently obtained judgement is not an error of the court, but a fraud on the part of Ms. Knapp to which the court processes in Vermont are unable to provide redress because of the unconstitutional statute to which the lower court is bound. The VT Supreme Court has not addressed the constitutionality of the statute and has not made available to Mr. Dasler a venue in which such a challenge may be raised.

95. Ms. Knapp's pre-trial ex-parte restriction of Mr. Dasler's parental rights and contact was a self-award of "primary caregiver" status such that it eliminated her burden of proof in the proceedings.

96. The statute that allows Ms. Knapp to veto shared parental rights deprived the court of the authority, under Vermont law, to preserve Mr. Dasler's parental rights without her consent.

97. Consequently, her pre-trial elections did not need to be justified in any proceeding but sufficed to strip the court of the ability to preserve Mr. Dasler's rights without Mr. Dasler proving it would be harmful for Ms. Knapp to retain custody. Conversely, Ms. Knapp did not need to prevail on the merits of her accusations or even be the parent acting most in the child's best interest in order to prevail according to established precedent in VT(including Knutsen 2016 and Cabot v. Cabot)

98. Ms. Knapp's accusations were also calculated to act as a smoke screen to avoid scrutiny of her own history of abuse towards Mr. Dasler and her mental health issues that have been life threatening to both parents.

99. Mr. Dasler doesn't think these issues need to be detailed here because the fundamental issue is illustrated by Ms. Knapp's ability to take advantage of Vermont processes to usurp the authority of the court for her own purposes and preclude adjudication with her own pre-judgement.

**Claim 8 – Intentional Infliction of Emotional Distress**

100. This claim is illustrated by the combination of all preceding claims.

101. Ms. Knapp sought to make Mr. Dasler perpetually threatened by court action and her constant presence on the grounds during visitation.

102. The regular accusations made by Ms. Knapp and supported by her parents made Mr. Dasler feel that he was not safe anywhere and could be subjected to court action without cause.

103. Mr. Dasler's decision to record child exchanges and visitation was the outgrowth of Ms. Knapp's false allegation of 5/12/17 and RFA request of 5/15/17.

104. Consequently, when she made her false allegation of the injury to the child in the 7/19/17 filing, he could look back and have recordings from all exchanges to disprove her allegations. It didn't prevent her from depriving him of contact for weeks at a time, though, with false allegations, and subject him to intense distress and legal expense.

105. Mr. Dasler even had recordings of him driving around doing errands because he felt that he was not safe even then. This came to his rescue again when Ms. Knapp and her father falsely accused Mr. Dasler of "stalking" on 11/11/17 when they saw him in town.

106. They came up with an elaborate story of him waiting across the street, following them, and revving his engine as he drove by making an "angry face", which they claimed to somehow see in the dark on the interstate.

107. Mr. Dasler had receipts and recordings of the drive, and offered the evidence to the investigating officer.

108. After he called Ms. Knapp back and explained she did not pursue the issue any further.

109. Although Ms. Knapp filed complaints at any hint of an excuse(right down to an "emergency" complaint that Mr. Dasler walked down a set of stairs without holding the child's hand), she did not file anything after the "stalking" incident and signed no affidavit in support of the claim. Instead, she relied on submitting one of the police reports in her desperate post judgement filings on 2/28/18 relying on it to assert the claim without the risk of perjury.

110. When the child began saying "mommy hits" her, Mr. Dasler was again afraid that he would somehow be blamed. When such conversations arose he recorded them so that he could prove that he was not encouraging these statements, but rather encouraging her to raise them with the appropriate careperson(daycare and/or her therapist) any time she felt like someone was intentionally trying to harm her. He also told her to make sure she is saying only true things and to make sure she tries to understand the difference between intentional and accidental.

111. As predicted, when the child told the therapist mommy grabs and shakes her, Mr. Dasler

was blamed. After the child repeated it with her mom in the room her mother got angry and the child retracted the statement saying daddy told her to say it. Of course a 3 year old can't articulate the difference between being told to work through it with her therapist vs. being coach to lie.

112. When the therapist(who Ms. Knapp had sourced and continues to use as part of her legal team) told Mr. Dasler the child said he told her to say it, he produced several audio clips of these conversations and sent them to the therapist by email.

113. The therapist forwarded them to Ms. Knapp who used them in her frivolous Oct 2018 Motion for Contempt, which the court promptly dismissed.

114. It is clear that Mr. Dasler just isn't safe anywhere, and Ms. Knapp has made sure to make him feel constantly in danger.

115. Her history of abusive acts goes back years, and is well illustrated in a 2013 Police Report after Ms. Knapp and her parents had a fight over her cousin's 30th birthday party.

116. Mr. Dasler stopped her from taking a gas can and lighter to the car claiming she would "burn her parent's house down", and she then called her parents in a rage after being stopped from arson.

117. It culminated in Ms. Knapp's mother having an anxiety attack after a phone conversation with Ms. Knapp, and her father calling to tell her she gave her mother a heart attack.

118. Ms. Knapp became suicidal and after this call, and got in the car saying she would kill herself. When Mr. Dasler got in her way she ran him down with her car and he texted for help from the hood, and police responded.

119. Mr. Dasler has spent years of their relationship trying to keep her calm and settled in the midst of her mental health issues, and since he has left her she has targeted him at every opportunity.

**Claim 9 – Slander and Libel**

120. Ms. Knapp has falsely reported assault and abuse claims to the minor child's daycare providers and school district.

121. She also falsely reported such events and "attempted kidnapping" to extended family in the area, causing Mr. Dasler to be estranged from Ms. Knapp's family whom he had previously associated with.

122. She appears to have reported such acts to Mr. Dasler's former employer, David Ellis, when she involved him in the divorce proceedings. Mr. Dasler had previously quit working for Mr. Ellis and set up a business in competition with Mr. Ellis' string instrument business(a small component of his larger business).

123. Once she involved Mr. Ellis in the divorce, the contacts Mr. Dasler had through that company stopped responding to inquiries, and Mr. Dasler's business income dropped by 80%.

## DECLARATORY JUDGEMENTS

124. Mr. Dasler is also seeking the following declaratory judgements. These judgements are sought prospectively to prevent continued abuse through the Vermont Court system.

   1. **It is Unconstitutional for a party to a lawsuit to make pre-trial elections that deprive another party in the suit of their rights to due process.**
   2. **15 V.S.A. § 665 is Unconstitutional on it's face, and as applied by court precedent**
   3. **An accusation of abuse in family court should be held to the same standard whether made by DCF(the state), another parent, or any other party. In other words, a child registers no gain by an erroneous finding of abuse and such an accusation is not a "battle between the two parties" simply because one parent seeks to strip another parent of their rights.**

## Relief Sought

1. Compensatory and punitive damages.

2. Declaratory Judgements as outlined herein.

3. Legal Fees and Costs

4. Relief from enforcement of fraudulently obtained custody order.

5. Such other relief as is deemed fair and just.